PATRICK D. ROBBINS (CABN 152288)
Attorney for the United States

MATTHEW YELOVICH (NYBN 4897013)
Acting Chief, Criminal Division

DAVID J. WARD (CABN 239504)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    Fax: (415) 436-7230
    david.ward@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | NO. CR 21-00096 WHO |
| Plaintiff, | UNITED STATES' SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD DEPARTURE UNDER U.S.S.G. § 5K1.1 |
| v. | |
| SANDRA ANN ZUNIGA, | Sentencing Date: December 14, 2023 |
| Defendant. | Time: 1:30 p.m.<br>Judge; Hon. William H. Orrick |

## INTRODUCTION

Defendant Sandra Ann Zuniga comes before the Court for sentencing after pleading guilty to one count of Conspiracy to Commit Money Laundering. Zuniga admitted that she helped her then-boyfriend Mohammed Nuru conceal and launder over $26,000 in bribe payments Nuru received from individuals seeking business from the San Francisco Department of Public Works. Zuniga was a knowing participant in the money laundering scheme. She has admitted she knew what she was doing was wrong. However, Zuniga did not participate or profit from the underlying corruption itself, and she received little personal benefit for laundering Nuru's bribe money. Moreover, when confronted by the

U.S. SENTENCING MEMO          1
CR 20-00353 WHO

FBI about her role in the scheme, Zuniga admitted her involvement and cooperated, providing timely and substantial assistance to the government in its investigation into Nuru as well as others.

Given this, the government asks the Court to grant its § 5K1.1 motion, vary down from the agreed-upon U.S. Sentencing Guidelines and impose a sentence of three years of Probation, including three months of home confinement, and 200 hours of community service.

I.  BACKGROUND

   a. Offense Conduct Overview

Defendant Zuniga was Mohammed Nuru's girlfriend throughout the time Nuru was engaged in his long-running honest services fraud conspiracy. As other cases before this Court have amply established, Nuru was the quintessential grifter; a deeply corrupt public official using his position of power to feed his greed and line his pockets with hundreds of thousands of dollars in cash, meals, drinks, and a host of other benefits.

Zuniga was not a direct participant in Nuru's rampant public corruption. However, Zuniga did knowingly launder over $26,000 in what she knew were bribes to Nuru. She admits that she deposited checks, some falsely labeled as payments to her, into her bank account, and then used the money as Nuru directed, concealing its source. *See PSR* ¶¶ 11-20. For example, Zuniga admitted to accepting a $10,000 check from Walter Wong, a contractor and permit expeditor who has pled guilty and admitted to providing Nuru with hundreds of thousands of dollars in bribes. *See United States v. Walter Wong*, 20-CR-0257 WHO. Zuniga stated that the $10,000 from Wong was disguised as a payment for "work performed" by Zuniga, even though Zuniga admits she had done no work. *PSR* ¶ 16. Zuniga admits that she deposited the check and then used the funds for Nuru's benefit. *Id.* In another instance, Zuniga accepted two checks from another individual, one for $5,000 and a second for $9,750 that were labeled for "housesitting." *Id.* ¶ 12. Zuniga admits that she did not perform any housesitting and that she instead directed the funds be used to Nuru's benefit, including bills and for work at Nuru's ranch. *Id.*

In total, Zuniga admits that she accepted $26,750 in cash and checks from individuals she knew were bribing Nuru intending to influence Nuru to act to their benefit.

## II. GUIDELINES CALCULATION

The government agrees with U.S. Probation's calculation of the U.S. Sentencing Guidelines, which are as follows:

| | | |
|---|---|---:|
| a. | Base Offense Level, U.S.S.G. §2S1.1(a)(2): | 8 |
| b. | Specific offense characteristics under U.S.S.G. Ch. 2: | |
| | The value of the laundered funds was between $15,000 and $40,000; U.S.S.G §2S1.1(a)(2); U.S.S.G. §2B1.1(b)(1)(C): | + 4 |
| c. | Defendant was a minor participant in the criminal activity: | _- 2 |
| d. | Zero-Point Offender USSG Reduction. U.S.S.G. § 4C1.1(a) | - 2 |
| e. | Acceptance of Responsibility, U.S.S.G. § 3E1.1(a), (b): | - 2 |
| f. | Adjusted Offense Level: | 6 |

## III. SENTENCING RECOMMENDATION

### A. Legal Standard

The U.S. Sentencing Guidelines serve as "the starting point and initial benchmark" of any sentencing process, and are to be kept in mind throughout the process. *See United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008); *see also United States v. Kimbrough*, 522 U.S. 85, 108 (2007). The overarching goal of sentencing, as set forth by Congress, is for the Court is to "impose a sentence sufficient, but not greater than necessary." *Carty*, 520 F.3d at 991. In accomplishing that goal, the Court should consider the factors set forth in 18 U.S.C. § 3553(a), to include:

   (1) the nature and circumstances of the offense and the history and characteristics of the defendant;

   (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

   (3) the need for the sentence imposed to afford adequate deterrence to criminal conduct; and,

   (4) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

### B. The Government's Recommended Sentence Vindicates the 18 U.S.C. §3553(a) Sentencing Factors

#### 1. The Nature and Circumstances of the Offense

Nuru's graft and entrenched corruption drove this offense. But defendant Zuniga's conduct was still knowing and criminal. It is clear from the evidence in the case, and Zuniga's own admissions, that she was fully aware of Nuru's corruption. Zuniga explicitly admits in her Plea Agreement that she knew that individuals seeking favors from Nuru were providing him with cash or gifts, including a $40,000 tractor for his ranch, checks and cash, meals, and even travel. *Dkt. 70* (Plea Agreement). More troubling, Zuniga understood that she was receiving bribes, and she deposited the bribe monies into her bank account to conceal their source. Zuniga knew she was engaging in money laundering for Nuru, and she knew her conduct was wrong. It is no defense that Zuniga did not participate in the bribery itself; she nonetheless played a key role in concealing, and thus perpetuating, Nuru's graft.

The impact of this corruption is well-known to the Court. It was an epic betrayal of the public trust in San Francisco. It was the corruption of one of the city's largest public agencies, the Department of Public Works. And the exposure of this crime certainly increased the cynicism that the public feels towards its elected and appointed officials.

Granted, defendant Zuniga was a minor participant in the larger scheme, and the government believes that the Court should take that into account. But the conduct remains serious and criminal, and warrants a sentence commensurate with Zuniga's role in the offense.

#### 2. The history and characteristics of the defendant

Sandra Zuniga is a highly-educated and accomplished public servant. She served as an Assistant Deputy Director for Operations at the San Francisco Department of Public Works, and then in 2016 was named as the Director of the Fix-It Team and Director of the Mayor's Office of Neighborhood Services. *PSR* ¶ 10. Zuniga has a bachelor's degree from Sacramento State University and a master's degree from Golden Gate University in San Francisco. *PSR* ¶ 55.

As such, defendant Zuniga should have (and admits she did) have a clear understanding of the fraudulent nature of Nuru's activities, and the fact that through her actions she was helping him to conceal his corruption and laundering his illicit funds. In short, defendant Zuniga should have known

better. Moreover, as a public servant herself, Zuniga should have known the harm that comes from public corruption and the bribery of public officials.

Throughout the conspiracy, Zuniga was in a serious romantic relationship with Nuru. *PSR* ¶ 46. Zuniga described the relationship as loving and committed. *Id.* Zuniga claims that Nuru was a stabilizing presence in her life, and that she became a part of his family, caring for his children, and helping to manage his money. *Id.* Defendant Zuniga claims that when she began managing his money that she was unaware of his criminal conduct, and that she initially viewed his requests to her to deposit cash and checks on his behalf as an indication that they were "growing as a couple." *Id.* That seems hard to believe given her background and the conduct she engaged in. But regardless, even if it was true initially, by Ms. Zuniga's own admission, she soon became aware that she was receiving thousands of dollars in illicit funds - bribes - from individuals seeking business with DPW, and was laundering those funds to conceal their source. *Id.* ¶¶ 11, 12, 13, 14, 16, 17, and 18.

Defendant Zuniga states that she was influenced to commit the offense because she was a "toxic people pleaser" who "did whatever my former boyfriend [Nuru] asked of me to earn his unconditional love." *PSR* ¶ 23. That is not an excuse. Being a toxic people pleaser is not a justification for money laundering.

### 3. The need for the sentence imposed to afford adequate deterrence.

Given defendant Zuniga's lack of prior criminal conduct, her remorse, and her acceptance of responsibility in this case, the government does not believe that a custodial sentence is necessary to deter Ms. Zuniga from future criminality. However, the government urges this Court to impose a significant sentence, commensurate with Ms. Zuniga's conduct, in order to send a message of general deterrence.

In white collar cases generally, and in public corruption cases in particular, the government believes that the Court should impose a sentence that is severe enough that it sends a clear and unequivocal message to others that participating in public corruption, even to a minor degree, will warrant significant punishment. As the District Court in the Northern District of Illinois explained:

> We need not resign ourselves to the fact that corruption exists in government. Unlike some criminal justice issues, the crime of public corruption can be deterred by significant penalties that hold all offenders properly accountable. The only way to protect the public from the ongoing

> problem of public corruption and to promote respect for the rule of law is to impose strict penalties on all defendants who engage in such conduct …
>
> Public corruption demoralizes and unfairly stigmatizes the dedicated work of honest public servants. It undermines the essential confidence in our democracy and must be deterred if our country and district is ever to achieve the point where the rule of law applies to all - not only to the average citizen, but to all elected and appointed officials.

*United States v. Spano*, 411 F.Supp.2d 923, 940 (N.D. Ill 2006).

The Court's sentence in this case can and should send a message that those convicted of public corruption offenses will face severe consequences commensurate with the damage that such crimes cause to the public's faith in government institutions, and that even individuals who play a minor role in the offense will nonetheless be subject to significant punishment.

## IV. MOTION FOR DOWNWARD DEPARTURE UNDER U.S.S.G. 5K1.1

### b. The Court Should Grant the Government's 5K1.1 Motion

"Upon motion of the government stating that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense, the court may depart from the guidelines." *U.S.S.G. § 5K1.1.* The Court may consider the following when determining the appropriate amount of the reduction; 1) the court's evaluation of the significance and usefulness of the defendant's assistance, taking into consideration the government's evaluation of the assistance rendered; 2) the truthfulness, completeness, and reliability of any information or testimony provided by the defendant; 3) the nature and extent of the defendant's assistance; and 4) the timeliness of the defendant's cooperation. *Id.*

*1.   Zuniga's Cooperation in the Government Investigation Into Mohammed Nuru*

In this case, Zuniga was confronted by the FBI in 2020 when Nuru was arrested and initially charged. Zuniga was cooperative with the FBI, admitting her guilt and accepting responsibility for her actions. More important, Zuniga provided the FBI with information about Nuru's bribe and the money laundering conspiracy. Zuniga described the conduct, provided bank and other financial records, explained the transactions to law enforcement. While multiple individuals cooperated against Nuru, Zuniga was particularly close to him, and as such, was in a position to provide - and did provide -

substantial assistance to the government in building its case against Nuru.

### 2    Zuniga's Assistance to the FBI Regarding Nuru's Co-Conspirators

In addition to providing evidence against Nuru, Zuniga also provided assistance to the government in developing evidence against other conspirators who were bribing Nuru. For example, Zuniga provided statements, which were corroborated, describing in detail the efforts of conspirators Alan Varela and William Gilmartin to bribe Nuru with cash, meals, and among other things, most notably a $40,000 John Deere tractor for Nuru for use at his vacation ranch. *See PSR* ¶ 19; *United States v. Balmore Hernandez*, 20-CR-0353 WHO; *United States v. Alan Varela*, 21-CR-0192 WHO; *United States v. William Gilmartin*, 21-CR-0192 WHO. Zuniga also provided evidence of conspirator Florence Kong's bribes to Nuru that included a $36,000 Rolex watch, along with cash and meals and drinks. *See United States v. Florence Kong*, 20-CR-0354 WHO.

### 3.    Zuniga Was Prepared to Testify at Trial Against Recology Executive John Porter

Finally, Zuniga was interviewed on multiple occasions and had agreed to be a witness in the government's case against Recology executive John Porter. *See United States v. Porter*, 22-CR-00270 WHO. While Porter eventually pled guilty, he did so only 25 days before trial. Had the case gone to trial, the government anticipated that Zuniga would have testified to Nuru's desire for payments from Recology to fund his holiday parties, how the parties were important to Nuru as a way for him to demonstrate his power and influence within the City of San Francisco, and how he used Recology's need for his influence to pressure them to pay him.

Overall, the government found Zuniga to be persuasive and credible, and in the government's view, her cooperation qualifies as substantial assistance to the government under § 5K1.1.

**c.    The Government's Sentencing Recommendation Avoids Unwarranted Disparities**

Section 3553(a) identifies the need for the Court to impose a sentence that avoids unwarranted sentencing disparities between similarly situated defendants. While the Court can and should look to other sentences imposed in this case, defendant Zuniga is somewhat uniquely situated. First, she did not participate the broader public corruption scheme. While she did receive some benefit from Nuru's bribes (meals, holiday gifts, payment for a trip to South America), she not not personally or financially benefit in a way similar to other defendants. Nonetheless, by her own admission Zuniga was a knowing

participant in a money laundering scheme that helped Nuru to facilitate and conceal his graft and corruption. As such, defendant Zuniga played a role in a scheme and conspiracy that facilitated widespread public corruption, including undermining and corrupting the business of the public at one of San Francisco's largest public agencies, the Department of Public Works. And when exposed, the corruption undermined trust in government, sowed cynicism and mistrust among the public,.

Given this, a significant sentence is warranted. However, a custodial sentence in this case would create an unwarranted disparity in sentencing, imposing on her a punishment this Court has reserved for those more culpable defendants, individuals who participated directly in the bribery and personally profited from the graft. *See United States v. Ken Wong*, 23-CR-0182 WHO; *United States v. Balmore Hernandez*, 20-CR-0353 WHO; *United States v. Alan Varela*, 21-CR-0192 WHO*; United States v. Florence Kong*, 20-CR-0354 WHO

Zuniga did not personally profit, and she played a minor role in the offense. She also cooperated. Given all this, the government believes that a sentence of three years of Probation, with a three-month term of home confinement, is an appropriate and proportional sentence in this case

### d. Community Service in Lieu of a Fine is Appropriate

Unlike many of defendants in the public corruption cases before the Court, Zuniga does not have independent wealth or significant assets. Therefore, a fine is not warranted. However, defendant Zuniga should nonetheless be required to pay a cost for her crime. In this case, a sentence that includes 200 hours of community service would be an appropriate way for defendant Zuniga to pay back to the public some of the costs of her crime.

//
//
//
//
//
//
//
//

## V. CONCLUSION

For the reasons outlined above, the government asks that the Court grant the government's motion for a downward departure under U.S.S.G. § 5K1.1, further agree to vary downward from the recommend U.S. Guidelines and to sentence defendant Zuniga to three years of probation, including three months of home confinement, and order that she complete 200 hours of community service.

PATRICK D. ROBBINS
Attorney for the United States

Dated: December 7, 2023

*/s/ David J. Ward*
DAVID J. WARD
Assistant United States Attorney